B. LIVINGSTON *against* C. C. ROOSEVELT and
C. I. ROOSEVELT.

THIS was an action of *assumpsit.* The plaintiff declared on a promissory note, dated *April* 26, 1805, drawn by the defendant, *C. I. R.* payable to *C. C. Roosevelt & Co.* and indorsed by the said *C. I. R.* in the name of *C. C. R. & Co.* to the plaintiff, who resides in the city of *New-York.*

When the note became payable, it was regularly protested for non-payment, and notice given to *C. C. Roosevelt.*

A judgment by default was entered against *C. I. Roosevelt.* The other defendant, *C. C. R.* pleaded *non assumpsit.* The cause was tried at the *New-York* sittings, in *December,* 1807, before Mr. Justice *Spencer.*

The defendants, in *February,* 1803, entered into copartnership in the city of *New-York,* and published, for two weeks successively, in the "*Evening Post*" and "*American Citizen,*" an advertisement, that they had entered into partnership in the *sugar refining business,* under the firm of *C. C. Roosevelt & Co.* and that their sugar-house was in *Thames-street.* Both these newspapers were taken by the plaintiff

In 1803, *A.* and *B.* entered into partnership as sugar refiners, and published in two of the gazettes printed in the city of *New-York,* (and which were taken by *C.*) that they had entered into partnership in the sugar refining business, under the firm of *A. & Co.* In *April,* 1805, *B.* without the knowledge or consent of *A.* purchased a quantity of brandy of *C.* for which he gave his individual note payable to the firm, and indorsed by him with the name of the firm. The bill of parcels, by the direction of *B.* was made out in his name only, and the brandies were shipped to the *West-Indies,* in a vessel belonging to *B.* and on his own account; and *C.* in order to obtain the drawback, made oath at the custom-house, that the brandy was sold to *B. A. & B.* had entered the name of the firm at two of the banks in the city of *New-York,* and *B.* drew checks, and made and indorsed notes in the name of the firm, which were regularly paid, and the banks had considered *A. & B.* as general partners. *C.* when he sold the brandy, required the partnership security, and it did not appear that he knew of the limitation, until after its dissolution in *June,* 1805, notice of which was also published in two of the newspapers.

It was held that the copartners were not liable on the note.

Where a person takes a partnership security from one of the partners, for what is known, at the time, to be a particular debt of the partner who gives the security, the copartnership is not liable.

Where there is a special or limited partnership, in any particular trade or business, one partner cannot bind his copartner, by any contract not connected with such trade or business. And a knowledge in third persons of the limited nature of the partnership, will be inferred from circumstances. *It seems,* that a publication in the gazette, of the nature of the copartnership, at the time of its commencement, is constructive notice to all those who may, afterwards, take the copartnership security.

during the time of the advertisement. The copartnership continued until *June*, 1805, when it was dissolved, and notice of the dissolution was given in the same newspapers. The note in question was given for 20 *pipes of brandy*, purchased of *John G. Bogert*, agent for the plaintiff, and which were in the hands of *Bogert*, as administrator of *Anthony Caroll*, deceased, and were sold in part satisfaction of a debt due from that estate to the plaintiff. The *bill of parcels* of the brandy, with the contents, the number and mark of each pipe, was made out by a clerk, in the name of *C. I. Roosevelt* only. The brandy was entered at the *custom-house*, in the name of *C. I. Roosevelt*; and to obtain the usual debenture, the plaintiff made oath at the custom-house, that the sale was to *C. I. Roosevelt*. This affidavit was made the 24th *April*, 1805, subsequent to the sale, and before the note was given. The clerk at the custom-house, who attended with the affidavit, testified, that when an article was sold for exportation, as he believed, to a copartnership, it was not uncommon in the affidavit made, in order to obtain the debenture, to state, that they were sold to one of the firm, without mentioning the other partners; but whether, in such cases, the sale was in reality made to the firm, or to the individual partner to whom it was stated in the affidavit to be made, he did not know. The brandy was actually exported in a vessel belonging to *C. I. Roosevelt*, and which had been purchased with his own note, without an indorser.

*J. G. Lockwood*, a witness for the defendant, testified, that, in the spring of 1805, he was employed by *C. I. Roosevelt*, as supercargo, on board the schooner *Elizabeth*, on a voyage to the *West-Indies*: this was the vessel purchased by *C. I. R.* as above mentioned. The cargo consisted of cloves, 20 pipes of brandy, purchased of the plaintiff, and a variety of other articles. *C. C. Roosevelt* had no interest or concern in the vessel or cargo.

*John Y. Cebra* testified, that he was a clerk of the defendants from 1804, until the dissolution of their partner-

ship. On the building where the copartnership business was conducted, was painted in large letters, "Sugar-House." He knew of no copartnership beyond the limits of the *sugar refining* business. The note in question was given at the dwelling-house of *C. I. Roosevelt.* No entry of the purchase of the brandies was made in the copartnership books, and he understood that it was a private speculation of *C. I. Roosevelt.*

*John Cross* testified, that he was directed to deliver the brandy by *John G. Bogert*, the agent of the plaintiff; but he received no directions from the plaintiff to make out the bill of parcels, nor did he recollect receiving any from *John G. Bogert.* Neither of them, as far as he knew, ever saw the bill. The bill was made out as *C. I. Roosevelt* directed. *John G. Bogert* directed the witness to call for the note, but gave no directions relative to the form in which it was to be made. He called on *C. I. Roosevelt*, at his dwelling-house, and received the note, and when he handed it to *J. G. Bogert*, no objection was made by him or the plaintiff relative to the form of it.

It appeared that at two of the banks, in the city of *New-York*, the defendants, from the commencement of their copartnership, had been in the habit of keeping partnership accounts, and had been there considered as general partners. That the entry of the partnership name of *C. C. R. & Co.* in the bank book of signatures, was in the hand of *C. I. Roosevelt*, and that the checks and other partnership paper which passed at the banks were generally signed by *C. I. Roosevelt*, in the name of the firm; that credit was given at these banks principally to *C. C. Roosevelt*, and that nothing was known, at either of them, of any limitation of the partnership.

The plaintiff proved by several merchants and others, that although they knew of the partnership, they never heard, until after its dissolution, of any limitation, though several of them took the newspapers in which the advertisements were published.

*John G. Bogert* testified, that he was the agent of the plaintiff; that the bargain for the brandies was made with *C. I. Roosevelt*, but he understood they were sold to and for the partnership, although nothing was said on whose account the purchase was made. The partnership engagement was to be given, and the sale was not completed, until he had satisfied himself, by inquiries, that the defendants were partners. He never heard of any limitation to the partnership, until after its dissolution, and he gave no directions to *Cross* to make out a bill of parcels. He believed when the sale was made, that the partnership was a general one.

The judge told the jury, that he was decidedly of opinion, upon the facts above stated, that the plaintiff was entitled to recover, and the jury accordingly found a verdict for the plaintiff.

The defendants moved for a new trial, on the ground of the misdirection of the judge, and because the verdict was against law and evidence. Two points were made:

1. A partnership security was taken for what was known to be the individual debt of one partner.

2. That if the individuality of the debt was not known to the plaintiff or his agent, still, in limited partnerships, one partner has no authority to bind the firm in a transaction out of the scope of the partnership.

*Griffin*, for the defendant. 1. The partnership of *C. C. Roosevelt & Co.* was special, being expressly limited to the sugar refining business. The note in question was given for *brandy*, and the purchase made exclusively for the interest of *C. I. Roosevelt*, and without the knowledge of *C. C. Roosevelt*. The plaintiff took a partnership security for an individual debt of one of the partners, *knowing* it to be so. The knowledge of the plaintiff, or his agent, that the security was for the individual debt of *C. I. Roosevelt*, is material, and is fully proved by the written documents in

the case. The bill of parcels made to *C. I. R.* is a contemporaneous exposition of the understanding of the parties ; for it is to be presumed, that if the sale had been actually made to the partnership, the bill would have been made out in the name of *C. C. Roosevelt & Co.* That is the natural and usual course of business. The entry at the custom-house for exportation, and the affidavit of the plaintiff himself, that the sale was made to *C. I. Roosevelt,* is strong evidence of the fact. Again, the form of the note is almost conclusive evidence, that the brandy was sold to *C. I. Roosevelt* alone. It is drawn by him alone, and he indorsed the name of the firm. If it was a copartnership debt, this mode of making and indorsing the note could give no additional security. If the name of the firm had been subscribed, as makers, each of the defendants would have been equally liable to the plaintiff.

It was expressly decided in the case of *Livingston* v. *Hastie* and *Patrick,*\* that a note given by one partner in the name of the firm, for his individual debt, was void, as against the firm, and even against a friendly indorser, not knowing on what account it was drawn, where the indorsee himself did not know for what the note was given. The same doctrine was recognised in the case of *Lansing* v. *Gaine* and *Ten Eyck.*†

2. But admitting that the plaintiff or his agent did not actually know whether the brandy was purchased for the individual account of *C. I. Roosevelt,* or not, still, in the case of a limited partnership, one partner has no power to bind his copartner for any thing out of the course of their copartnership dealings. The principle on which one partner is made liable for the acts of his copartner, is the implied assent arising from the copartnership ; but no assent can be presumed to any contract out of the scope of the copartnership business. Suppose a copartnership between two silversmiths, or shoemakers, could one partner bind his copartner, by giving notes, in the name of the firm, for ships or merchandise ? or suppose a partnership between two at-

\* 2 *Caines,* 246

† 2 *Johns. Rep.* 300.

\* *Watson on
Partn.* 180. (2d
*Ed.*)

† 3 *Term Rep.*
757. 760.

‡ *Watson*, 180.
16 *Vin. Abr.*
242. 1 *Salk.*
126. *Cowp.* 814.
6 *Vesey*, jun. 604.
1 *Esp. Cas.* 29.

§ 2 *Johns. Rep.*
300.

tornies, could one bind the other, by purchasing ships or goods in the name of the partnership ? In the present case, the copartnership was expressly limited to a particular manufacture or business. The distinction between general and limited partnerships has been long known and settled.\* In a general partnership, one partner has an unlimited power to bind his copartner, except by a bond or sealed instrument, or where there is a collusion with a third person to cheat the firm. In a special partnership, if one party uses the name of the firm, in matters out of the scope of the partnership, it not only is an abuse, but a transgression of his power. So a general agent may abuse his authority, and yet the principal be liable ; but if a special agent exceeds his authority, his principal is not liable.† It is only to act in the course of their particular trade or line of business, that an authority is delegated by partners to each other ; and it is only in such transactions that strangers have a right to go on the credit of the partnership funds.‡

There are two exceptions to the general rule on this subject: 1st. Where the partner who denies his liability, had an interest in, or derived a benefit from the contract ; 2d. Where due diligence or caution has not been used in informing the world of the nature of the partnership ; for the presumption must be, that the partnership is general, unless the contrary has been made known. *C. C. Roosevelt* cannot be brought within either of these exceptions ; he knew nothing of the purchase of the brandy, which was made solely and exclusively for the benefit of *C. I. Roosevelt.* The defendants did all in their power to make known to the public the limited nature of their partnership. Advertisement in the gazettes is the most usual, and certainly the most effectual, way of making such a fact known. It has been decided, that an advertisement in a gazette is sufficient notice of the dissolution of a copartnership ;§ for the same, or a stronger reason, it ought to be considered as sufficient notice of the nature of the partnership.

*T. A. Emmet*, contra.   If there is evidence sufficient to justify the jury, in finding their verdict, the court will not disturb it.   Mere knowledge of the nature of the partnership and of its being an individual transaction, is not sufficient; there must be collusion or fraud, and knowledge is only evidence of such fraud.   This knowledge ought to be strong and full, not slight or presumptive.

Sugar refiners must purchase raw sugar; it is not, therefore, improbable, but a fair inference, that the brandy was purchased as an adventure to the *West-Indies* on the partnership account, in order to procure the raw materials for the manufactory.   The testimony of *Bogert* is direct and positive, that he trusted to the credit of the partnership, and that he thought it a copartnership transaction. *Cross*, who made out the bill of parcels, was not the agent of the plaintiff.   He made it out agreeably to the directions of the person who called for it.

There is a material difference between a gazette notice of the dissolution of a partnership, and a notice of its nature and commencement.   The former operates immediately; but a notice of the nature or limitation of a partnership which may continue many years, may, in a short time, be forgotten by the world, who only see persons acting together as general partners.   These acts obliterate the remembrance of the former notice of the nature of the copartnership, published at its commencement; while the ceasing to act together, serves to confirm the recollection, and to recall the attention to the notice of the dissolution.   Persons who commence partnership in relation to a particular business, may, afterwards, extend it to some other objects, or to some particular business or adventure, *pro tanto ;* and how is the world to know whether they act according to the terms of the original contract or not? The sign affixed to the building where the manufactory was carried on, was no notice, for it did not express the nature of the copartnership.   There is no evidence that the note was drawn, in the manner it appears to be, by the direction of *Bogert.*   He naturally supposed

that it was done so by the desire of *C. C. Roosevelt &
Co.*

The true question is, whether there was any collusion between the plaintiff or his agent, and *C. I. Roosevelt*, to defraud *C. C. Roosevelt.* Knowledge of the fact, that the purchase was made for the individual account of *C. I. R.* and that he pledged the copartnership funds without the consent of his copartner, is essential to prove the covin or fraud. This is the doctrine to be collected from the cases on this subject.* Suppose a check drawn in the copartnership name on one of the banks, could the payment of the check be contested on the ground, that *C. I. R.* had drawn it on his own account, without authority from his copartner? Certainly not; for *C. I. R.* had authority to issue negotiable paper in the copartnership name. If a partner has power to issue negotiable paper, in the name of the partnership, such power is unlimited; and it is, *pro tanto*, a general partnership. The person who receives the partnership paper, is not bound to inquire, for what account it is given. Again, a partnership is created or grows by reputation, and *a fortiori*, an extension of it may be created by reputation. Admitting that the partnership was originally limited, yet by the acts of the parties it may become unlimited. Indeed, there can be no limited partnership, where one party has power to sign and indorse notes with the name of the copartnership. If *C. C. Roosevelt* meant to avoid responsibility on notes not given in the course of the copartnership business, he should have guarded against it, by stipulating that one partner should not indorse notes in the name of the firm.

Whether the partnership be general or special, one partner has no authority to bind his copartner for any thing not connected with the copartnership business. But the only question is, whether there was fraud or covin; the *English* decisions go on the ground of fraud,† and the jury are the proper judges how far fraud is made out by the evidence.

* *Watson,* 202. 3 *Vesey,* jun. 540. *Ex parte Bonbonus.* 7 *East,* 210. *Swan v. Steele.*

† 1 *East,* 48. 2 *Bos. Cas.* 523.

NEW-YORK,
May, 1809.

Livingston
v.
Roosevelt.

*Harison*, in reply. If fraud invalidates the security which has been taken, and knowledge in the party receiving it, is evidence of that fraud, it must be conclusive evidence. It is the duty of every person who takes paper signed or indorsed by a copartnership name, to inquire, and know whether the party who gives it, has authority to sign the name of the firm. If, from all the evidence, the jury ought to have inferred that the plaintiff or his agent did know, that the note was given and indorsed for the individual debt of *C. I. R.* the verdict ought to be set aside.

That the brandy was purchased to send to the *West-Indies*, to be converted into raw sugar for the use of the copartnership, is an idea not warranted by the evidence. The written evidence in this case ought to outweigh the testimony of *Bogert*, the agent, who may naturally be supposed to have some bias in favour of his principal. The making out of the bill of parcels in the name of *C. I. R.* was a sufficient intimation to the plaintiff's agent, that the purchase was for the individual partner, and he ought to have inquired of *C. C. R.* whether he consented to give the note. The peculiar manner in which the note was drawn, was of itself sufficient to put *Bogert* on the inquiry, as to its being a copartnership transaction ; and the oath of the principal at the custom-house, that the sale was to *C. I. R.* ought to be held conclusive evidence of the fact.

If an advertisement in a gazette, is sufficient evidence of the dissolution of a copartnership, it ought to be evidence, also, of its limited nature. The transactions at the bank were perfectly consistent with a limited partnership. Reputation is *prima facie* evidence only of a partnership, but it must be connected with acts to establish the fact. Mere reputation is not enough to create a partnership ; if it were, it would be easy for one man to make another liable, as a partner, without his knowledge or consent.

In the case *ex parte Bonbonus*,[*] the lord chancellor said, " that if under the circumstances, the party taking the paper could be considered as advertised, in the nature of the

[* 8 *Vesey*, jun. 540.]

transaction, that it was not intended to be a partnership pro.. ceeding, it should not bind them." The nature of the purchase, in the present case, and the circumstances attending it, were certainly sufficient to advertise the plaintiff or his agent, that this was not a partnership transaction.

If the doctrine contended for, on the part of the plaintiff, should be established, there must be an end altogether of limited partnerships. In every partnership, each partner must be authorised to use the name of the firm, in relation to the copartnership business. If the parties were to agree that they should sign their names separately, this would not be binding on third persons, and if one partner should use the name of the firm, in the course of the partnership business, the partnership would be bound, though done in violation of the agreement between the partners.

Van Ness, J. Whether the plaintiff knew that the debt for which he received the partnership security, was the private debt of *Cornelius I. Roosevelt*, is a question of fact, and we are called upon to decide whether, if that question had been submitted to the jury, they ought not to have found for the defendant. The partnership was special, being limited to the sugar refining business in the city of *New-York*, where all the parties resided. At the time the partnership was formed, notice was given for two weeks, successively, of the nature and extent of it, in two daily papers, published here, both of which the plaintiff took during that period. The house where the business was to be transacted was designated in the notice, and " Sugar-House," in large letters, was painted upon it. The defendant, *Cornelius C. Roosevelt*, at no time consented, or was privy to any extension of the connection, beyond the particular object for which it was originally formed. The article sold, and which was the consideration of the note in question, had no relation to the business of sugar refining, and it would, therefore, never have occurred to any one, that *Cornelius I. Roosevelt* purchased it on the partnership

account, unless he had expressly declared that to be his intention. There was nothing, either in the acts or declarations of *Cornelius I. Roosevelt*, from which the plaintiff's agent could infer, that he bought the brandy for the use of the company. The contract was made with *Cornelius I. Roosevelt*, without the knowledge or consent of his co-partner. He gave *his* note at his *own house* (and not at the counting-house of the company) for the payment of it, with the indorsement of the firm, as collateral security; and the note, in this form, was received by the plaintiff, without objection. The manner in which the note was drawn is inconsistent with the idea of a sale to the firm. It is not hazarding any thing when I say that, where a sale has been made to partners, it would be a perfect novelty among merchants to receive the note of one of them indorsed by the firm. There could be no possible use in it. No additional security was derived from its being given in that form. After the contract for the sale, but before the delivery of the note, the plaintiff himself (and this is the only instance of his personal agency in the whole transaction) made oath at the custom-house, that the sale was made to *Cornelius I. Roosevelt*; thus giving the highest, most solemn, and satisfactory evidence of his understanding of the sale, at the time when it was made, and which is in exact coincidence with all the documentary and other evidence in the cause, even with that of Mr. *Bogert*, which I shall presently notice. Upon this evidence, I am persuaded, the jury would have found, that the sale was made to *Cornelius I. Roosevelt*, in his individual capacity; that this was known to the plaintiff; and, consequently, that, originally, he only was liable for the payment of it. This court has often decided, that one partner cannot pledge the partnership security for what is proved to be the separate debt of such partner, without the consent or privity of the other partners. (*Livingston* v. *Hastie & Patrick*, 2 *Caines*, 246. *Lansing* v. *Gaine & Ten Eyck*. 2 *Johns. Rep.* 300.) In the case of *Dubois* v. *Roosevelt*, decided in *May* term,

1808, and which is not reported,(a) the facts were almost precisely similar to those I have above stated. The court, in that case, were unanimously of opinion, that the

(a) The court thought that case so precisely similar in principle to that of *Livingston* v. *Hastie & Patrick*, that it was not deemed important to report it ; but since it has been referred to, it is thought proper to subjoin the following account of the case :

DUBOIS *against* C. C. ROOSEVELT & C. I. ROOSEVELT.

THIS was an action of *assumpsit*. The plaintiff declared on a promissory note, dated the 27th *April*, 1805, drawn by the defendant, *C. I. Roosevelt*, payable to *Cornelius C. Roosevelt & Co.* and indorsed by *C. I. R.* with the name of *C. C. R. & Co.* A judgment by default was entered against *C. I. Roosevelt*, and the other defendant pleaded *non assumpsit*. The cause was tried at the *New-York* sittings, in *June*, 1807, and a verdict was taken for the plaintiff, by consent, subject to the opinion of the court, on a case, containing the following facts :

On the 3d of February, 1803, the defendants entered into a copartnership in the sugar refining business, in the city of *New-York*, where the plaintiff also resided, and the following advertisement was inserted in the "Evening Post, and the " American Citizen," two newspapers published in the city. " *Copartnership. Cornelius C. Roosevelt* and *Cornelius I. Roosevelt*, have entered into partnership, in the sugar refining business, under the firm of *Cornelius C. Roosevelt & Co.* Have ready for sale, loaf and lump sugar of a good quality ; also molasses, at their sugar-house in *Thames-street*, in the rear of the City Hotel."

The copartnership was dissolved in *June*, 1805, and public notice of the dissolution given.

In *April*, 1805, the plaintiff sold to *C. I. Roosevelt*, a quantity of beef, the bill of which was made out in the name of *C. I. Roosevelt*, and his own note, without any indorser, was received for the amount. A short time afterwards, the plaintiff sold to *C. I. Roosevelt*, a quantity of cloves, for which, by agreement, he was to give his note, with a good indorser. The cloves were purchased by *C. I. Roosevelt*, on his own account, and the bill of parcels was made out in his own name only. The note in question was drawn by *C. I. Roosevelt*, and indorsed by him, in the name of the firm, and given for the cloves to the plaintiff. The note was protested for non-payment, and due notice thereof given to the defendants.

The defendant, *Cornelius C. Roosevelt*, was in no manner interested in the purchase of the cloves, which were purchased for an adventure, in which he had no concern. They were exported in the name of *C. I. Roosevelt*, and in order to obtain the usual debenture, the plaintiff made oath at the custom-house, that the sale was to him. ·

It appeared that the business of the partnership was principally transacted by *C. I. Roosevelt*, and that he made notes issued for the sugar refining business, and signed the name of the copartnership. The plaintiff sent a clerk

plaintiff could not recover, without overruling the principles laid down in *Livingston* v. *Hastie & Patrick*, and *Lansing* v. *Gaine & Ten Eyck*. The only difference between these

to the counting-house of the defendants, for the note, and the same was received from *C. I. Roosevelt*, at the counting-house of the firm, which was in the building where the copartnership business was carried on. On the outside of the building was a sign painted in large letters: " Sugar-House," and " *Cornelius C. Roosevelt & Co.'s Office*."

It was admitted that there was no fraud or collusion on the part of the plaintiff; but that his intentions were fair, and his conduct *bona fide*.

*Brinkerhoff*, for the plaintiff, attempted to distinguish this case from those of *Livingston* v. *Hastie & Patrick*,[*] and *Lansing* v. *Gaine & Ten Eyck*,[†] and admitted, that unless the case could be distinguished from them, the plaintiff must fail. In those cases, the action was against the makers, here it is against the indorsers, which precludes any inquiry into the original transaction on which the note was founded. He observed, that the cases decided in *England*, went on the ground of fraud and collusion between the parties, and in the present all intention of fraud was negatived. He cited the case of *Swan and others* v. *Steele*,[‡] in which Lord *Ellenborough* held, that where a person *bona fide*, and without any fraud, receives a note indorsed by one of several partners, in the name of the firm, it should bind all the partners.

* 2 Caines, 246.
† 2 Johns. Rep. 300.

‡ 7 East, 210.

*Griffin* and *Harison*, contra, relied on the case of *Livingston* v. *Hastie & Patrick*, and that of *Lansing* v. *Gaine & Ten Eyck*, as precisely in point. They contended, that the case of *Swan and others* v. *Steele*, was in favour of the defendant, as Lord *Ellenborough* recognised the principle, that where a person takes the copartnership firm, as security for the individual debt of one partner, knowing that it was without the consent of the other, it is fraudulent and void. *Knowledge* of the fact of its being out of the copartnership business, or not, made all the difference. They cited, 1 *Salk.* 126. *Cowper*, 814. 6 *Vesey*, jun. 604. 1 *Caines*, 184. *Watson on Partnership*. 2 ed. 180.

*Hoffman*, in reply, was stopped by the court, who seemed to think, that there was no difference between this case and that of *Livingston* v. *Hastie & Patrick*. *Hoffman* said he should decline arguing the cause; for unless the court thought the distinctions taken by *Brinkerhoff* were well founded, the plaintiff could not prevail.

*Per Curiam.* We are of opinion, that this cause is clearly within the principle decided in that of *Livingston* v. *Hastie & Patrick*, and that the plaintiff must be nonsuited.

Judgment of nonsuit

two cases and the present, is that which may be supposed to arise out of the evidence, that the defendants were considered to be general partners at two of the banks, and by several merchants in this city, who were witnesses on the trial, and the testimony of *John G. Bogert*, the plaintiff's agent. As to the first, if mere reputation is sufficient to enable one of several special partners, to charge another in a case circumstanced as this is, then there is an end, as to third persons, of all limited partnerships. In point of fact, here was not a general partnership. Of this notice was given in a manner best calculated to apprise the community of it. What other precautionary measure could the defendant have taken? After this notice, not a single act at any time appears to have been done by *Cornelius C. Roosevelt*, from which a well founded reputation of a general partnership could have originated. Besides, this reputation, at most, is but presumptive evidence of a general partnership, and the force of this is completely destroyed by direct and positive proof, that the partnership was limited to a particular object. Next, as to the testimony of *Bogert*, which was much relied upon.

On a critical examination of his evidence, it will, I think, be found to operate against the plaintiff. He says, in the first instance, that he understood the sale of the brandy to be " to and for the partnership ;" but he adds immediately afterwards, " that nothing was said on whose account the purchase was made ;" but " that the partnership security was to be given for it." He goes on to state, " that the sale was not completed until he had satisfied himself, *by inquiries*, that the defendants were partners." Now the fact stated by *Bogert*, that the partnership *engagement* was to be given, is the only one from which it can be inferred, (for he no where says so in express terms) that *he* even supposed the sale was made to the company ; and when we see *how* that was in fact given and received, without objection, and take into view the other facts in the case, the fair conclusion is, that he, considered the contract as made

with *Cornelius I. Roosevelt,* individually, and that all he was solicitous about, was to obtain the partnership security for the payment of it. If *Bogert* really conceived this to be a sale to the firm, is it not very singular that he never came to an explanation to that effect with *Cornelius I. Roosevelt?* Yet it does not appear, that during the whole negotiation, a syllable was uttered as to whom, or on whose account it was made; and this is the more surprising, when it appears that he made *inquiries* to satisfy the doubts and suspicions which he entertained of the existence of a partnership *at all.* Why, when making these inquiries, did he not apply to *Cornelius C. Roosevelt,* whose security he wished to obtain, and who was the only one able to give him correct information? I confess that I am not satisfied with this testimony; and, after a careful review of all the circumstances, I cannot perceive how the jury could avoid saying that the plaintiff made the sale to *Cornelius I. Roosevelt,* in his private capacity; and that the debt, for which the indorsement of the firm was taken, was his private debt, contracted without the concurrence of *Cornelius C. Roosevelt,* expressed or implied : and if they had so found, it is conceded, that the partnership security, as against *Cornelius C. Roosevelt* in judgment of law, is fraudulent and void.

But there is another equally fatal objection against the plaintiff's right to recover.

The distinction between *general* and *special* partnerships, is probably coeval with their existence. A general rule applicable to both is, that in transactions relating to the joint concern, one of several partners may bind the rest. He may sign notes, indorse or accept bills for the common benefit, &c. without applying to the rest in every particular case. But this authority of a single partner has its limitation. Formerly, as appears by the case of *Parkney* v. *Hall,* (1 *Salk.* 126. and S. C. 1 Ld. *Raym.* 175.) it was probably less extensive than at this day. One partner of the concern has no authority to pledge the partnership goods, for his own debt, nor can he bind the firm to any

engagements known at the time to be unconnected with, and foreign to, the partnership. This has not only been so settled by this court, but now is, and always has been the established law in *England.* Not an adjudged case, nor, I believe, a single *dictum*, can be found the other way. This will appear from most of the cases which I shall presently have occasion to mention for another purpose. In *special* partnerships, however, this power of the individuals composing them, is restricted to still narrower limits, and can only be legally exercised within the compass of that particular business to which the partnership relates. It is as circumscribed as the partnership itself. It is, therefore, analogous to that which is conferred on an agent appointed for a special purpose, who, if he exceed his authority, cannot bind his principal. (*Fenn and another* v. *Harrison and others.* 3 *Term Rep.* 757.) This analogy is complete, in all cases, where third persons have dealings with a special partner, with notice that he is such. And, accordingly, it has been repeatedly ruled that, whenever such a partner pledges the partnership funds, or credit, in a transaction which is known to be unconnected with, and not fairly and reasonably within, the compass of the partnership, it is, as to the other partners, fraudulent and void. They, however, to entitle themselves to the protection of this rule of law, must not do, or consent to, or suffer any thing to be done, which may hold them out to the world as general partners; and it would always be prudent and proper (though I will not say it is indispensably necessary) to give public notice to the community, that the partnership is special, and of the particular species of traffic or business to which it is confined. (*Cowp.* 814. *Willet* v. *Chambers.* 1 *Esp. N. P. Rep.* 29. *De Berkom* v. *Smith and another.* 2 *Esp. N. P. Rep.* 524. *Arden* v. *Sharpe and another.* 1 *East,* 48. *Shirreff and another* v. *Wilks.*) In the case, *ex parte Bonbonus*, (8 *Ves.* 540.) Lord *Eldon* expresses himself thus : " I agree *it is settled*, that if a man gives a *partnership engagement* in the partnership name, with regard to a transaction, *not in its nature a partnership transaction*, he

who seeks the benefit of that engagement *must be able to say*, that though in its nature not a particular transaction, *yet there was some authority beyond the mere circumstance of partnership, to enter into that contract so as to bind the partnership;* and then it depends upon the degree of evidence." Nothing has been done, in the present case, to impair the claim to the benefit of this rule. The business, as far as it relates to *Cornelius C. Roosevelt*, has been carried on, for aught that it appears to the contrary, conformably to the terms upon which the partnership was formed. He has done no act to countenance a belief, that these terms were different from those specified in the notice. He was a stranger to the purchase of the brandy; he had no agency nor interest in the shipment of it afterwards; it was manifestly an article unconnected with the objects of the partnership; nor was there any thing in the nature of the transaction, or the manner of conducting it, to justify a belief of the contrary. It has indeed been urged, that it might have been purchased for the purpose of exportation to the *West-Indies*, and of bringing back from thence a cargo of raw sugar, to be refined in *New-York*, on the partnership account. But the suggestion is not supported by the evidence. The whole transaction wears a different aspect. Suppose this had turned out to be a lucrative speculation. Certainly *Cornelius C. Roosevelt* would have had no claim to a participation in the profits. Therefore, there is no justice in imposing upon him the whole of the loss. Had it been submitted to the jury to decide whether the purchase of this brandy was connected with the business of the partnership, I think they would have decided in the negative.

There is no collision between what I have said, and the cases *ex parte Bonbonus*, (8 *Ves.* 540.) and *Swan* v. *Steele*, (7 *East*, 210. As I understand these cases, they were decided upon the very principles which I have attempted to establish. To borrow money, and to negotiate bills and notes, are as incidental to, and as usual and necessary in, a *special*, as a

general partnership. Business of this sort falls equally within the scope of the one as the other; and, in the absence of all fraud, the authority of the individual partners to bind the company is the same in both. This is one of the risks common to all kinds of partnerships; and it would be repugnant to commercial policy and convenience, to make any distinction, in this respect, between them. The reason why this would be the tendency of such a distinction, is obvious. In all money concerns, and negotiations in commercial paper, there is nothing upon the face of them foreign from a limited partnership; nothing to awaken suspicion or excite inquiry; and if one partner, in the course of business, abuse the special trust in him, innocent third persons might suffer.

My opinion is, that there ought to be a new trial, with costs, to abide the event of the suit.

THOMPSON, J. and YATES, J. were of the same opinion.

SPENCER, J. It cannot, I think, be pretended, that in point of fact, the plaintiff knew, when the brandy was sold, that it was on the private account of *Cornelius I. Roosevelt.* Mr. *Bogert* is explicit in his testimony, that the sale was on the credit of the partnership; that he knew of no limitation of the partnership, but, after inquiry, believed it to be general.

The circumstances which are supposed sufficient to render the plaintiff chargeable with notice of the limitation of the partnership, appear to me to be susceptible of easy explanation. From the evidence, in relation to the publication in the gazette, considering the lapse of time from the insertion of the notice, and the fact that the plaintiff was not engaged in commerce, with the further fact, that merchants who took both the papers, were ignorant that the partnership was special, and had not attended to the notice, my mind is decisively impressed, that the plaintiff cannot be supposed ever to have retained it in his recollection. The

bill of parcels and form of the note, which were the acts of *Cross*, ought, on no principle, to excite suspicion, for *Cross* was not the agent of the plaintiff, and, as he has testified, proceeded without any instructions from the plaintiff or Mr. *Bogert*, in making out the bill and in taking the note. The affidavit at the custom-house was made after the sale by *Bogert*; it is, therefore, impossible that he should have given information to the plaintiff, that the sale was to *Cornelius I. Roosevelt*, contrary to the fact to which he testifies, that the sale was to the firm and on its credit. The affidavit was substantially true, and ought to be construed in reference to the object to be affected by it.

As it regarded the *United States*, it was perfectly immaterial whether the affidavit stated a sale to one or all the vendees; the object was to identify the goods, and obtain a debenture. I cannot but consider, for the reasons which I have given, that it would be contrary to the facts in the case, to suppose the plaintiff knew that there was a special limited partnership when the brandy was sold, and, with this knowledge, is making an attempt to charge one of the firm for articles sold to the other; it would be neither more nor less than presuming a fraud, without a fact to support it.

The case ought to be tested by other principles, and if on those principles the defendant, *Cornelius C. Roosevelt*, is not responsible, then the plaintiff must submit to his loss.

I recognise the authority of the cases of *Livingston* v. *Hastie & Patrick*, and *Lansing* v. *Gaine & Ten Eyck*, and fully assent to the law, that where a person takes a partnership security from one of a firm, knowing it to be for his private concerns, and disconnected with the objects of the partnership, the other partner is not chargeable, and he is not responsible, in consequence of the collusion and fraud. I hold it to be equally well settled, that if a person, in the course of trade, *bona fide* takes a bill, uninformed that it was given without the knowledge of the other partner, and not in relation to the partnership concerns, whether the partnership be a limited one or general, the whole firm will be

NEW-YORK,
May, 1809.

Livingston
v.
Roosevelt.

\* 7 *East*, 210
† 8 *Ves.* 540.

bound. The cases of *Swan and others* v. *Steele and others*,\* and *ex parte Bonbonus*,† though not authoritative here, justify the position I have made. These cases decide, that a *bona fide* holder of a bill, for a sufficient consideration, and without notice that it was given by one partner for an individual debt not relating to the partnership, might recover against all the partners, though the bill was in fact given by one of them for a debt not relating to the partnership. But whatever might have been the objects of the defendant's partnership, in its inception, it appears to me, that the evidence in the case shows, conclusively, that by their own acts, the reputation that it had become general was well warranted.

The defendants, from the commencement of the partnership, kept accounts at two of the banks in the city, and had there been considered as general partners; the entry of the partnership firm was in the hand-writing of *C. I. Roosevelt*, in the name of the firm; credit was given to the partnership on the responsibility of *C. C. Roosevelt*, and nothing was known, at either of the banks, of a limitation of the partnership business, until after its dissolution. In addition to this, the presidents and cashiers of the two banks, several merchants of extensive business, and brokers, testified, that they knew of the partnership, but never heard of any limitation, until after the dissolution. It cannot be denied, that a special partnership may become general, from the acts of the parties in the conducting of their business, as well as from their specific arrangements. It is impossible to believe, that *C. C. Roosevelt* did not know of the mode adopted in carrying on business with the banks, and that he was there regarded as a general partner; and if he did, then it seems to me to follow, that he aided and assented to his being consi-ed a general partner. It is probable that the reputation of a general partnership proved so fully, and not attempted to be contradicted, had its origin in the mode the defendants adopted, in carrying on their business at the banks; and certainly the authority devolved on *C. I. Roosevelt* to negotiate

paper at the banks, warranted the reputation, and renders both the defendants liable. The case seems to consider the plaintiff as the principal, and *Bogert* as the agent, in the sale of the brandy, but I cannot see on what facts this is founded. The legal property of the brandy was in *Bogert*, and the plaintiff was merely a creditor beneficially interested in the proceeds, without any authority to control or direct the disposition of the property. But it is not necessary to scrutinize or enlarge on this part of the case, as it will not change my opinion, be the fact either way.

One of two innocent men must suffer; I cannot hesitate in saying, that the person who has been so incautious in adopting a partner, deficient in prudence or funds, who has given to that partner the management of the concerns, who has stood by, and permitted him to raise money unlimitedly on his credit, by pledging the name of the firm, and who has thus given his aid to the reputation which certainly existed, and on which the credit in this case was given, must be responsible.

KENT, Ch. J. The plaintiff cannot succeed in this case, if the facts warrant the conclusion, that he took a partnership security for a debt which he actually knew, at the time, was the private debt of the particular partner. Nor can he succeed, if this actual knowledge be not made out, provided the subject matter of the contract, and the nature and circumstances of the copartnership, were sufficient to charge him with constructive or legal notice of the fact. Believing these propositions to be correct, I shall examine the case to see if, according to them, the plaintiff can be permitted to retain the verdict.

1. The law is well settled, that if a person takes a partnership security from one of the partners, for what is known, at the time, to be the particular debt of the partner who gives such security, the copartnership is not holden. The cases in this court of *Livingston* v. *Hastie & Patrick*, and of *Lansing* v. *Gaine & Ten Eyck*, (2 *Caines*, 246. 2

*Johns. Rep.* 300.) were decided upon this ground ; and the cases in the *English* courts of *Arden* v. *Sharpe & Nelson*, *Shirreff* v. *Wilks*, and the case *ex parte Bonbonus* in *Chancery*, (2 *Esp. Rep.* 524. 1 *East*, 40. 8 *Vesey*, jun. 540.) all recognise the same principle. The knowledge in the creditor, that the partnership name is given for the individual debt of one partner, renders the transaction fraudulent and void in respect to the copartnership. In the present case, the jury were told, that by law the plaintiff was entitled to recover. According to my view of the case, it ought to have been observed to the jury, that the weight of evidence was in support of the allegation, that the plaintiff understood, at the time, that he was contracting a debt with *Cornelius I. Roosevelt*, in his individual capacity, and that, therefore, the plaintiff was not entitled to recover. Let us cast an eye over the material facts.

The note in question was given for 20 pipes of brandy, sold to *C. I. Roosevelt*, and there is no evidence in the case, that *Cornelius C. Roosevelt & Co.* ever dealt in the article of brandy, or carried on any business in the grocery line, or were concerned generally in trade. There was no evidence that the firm ever held themselves out to the world, as being engaged in any other concern than the sugar-refining business, nor that they ever did in fact step beyond that limited concern. The plaintiff was then unauthorised to conclude, that this purchase was upon a partnership account. *Prima facie*, it certainly was not, and it lay with him to show what colour he had for a contrary inference, and if he has shown none that is reasonable, he is not well founded in his attempt to charge this debt upon the firm.

The intrinsic circumstances of the transaction are sufficient to show, that the plaintiff knowingly dealt with *C. I. Roosevelt*, in his private capacity, and there can be no doubt but that, as a matter of fact, the purchase of the brandies was on the separate account of *C. I. R.* and that the partnership was not interested in the purchase. The brandy was not only purchased by *C. I. Roosevelt*, but shipped by him

for the *West-Indies*, on board a vessel owned by him indi-
vidually, and with other goods purchased and shipped by
him on his private account. He drew this note, in his own
name, for the purchase-money, in favour of the company,
and then indorsed the name of the firm, and delivered the
note, so indorsed, to the plaintiff. What can be plainer
than the language of this fact, that the note was drawn, and
received for a private debt, and that the firm was only given
as a security? Was it ever known before, that one partner
contracting a debt, in behalf of the copartnership, took this
circuitous mode to give the note of his house? There could
be no possible use in it, and merchants are not accustomed
to take such indirect methods in doing business, without a
motive. If it was understood to be the proper debt of the
company, why was the individual partner bound directly
and absolutely for the money, and the company only con-
tingently, in the character of indorsers? Why did the plain-
tiff, when he sold to a company, take upon himself the bur-
then of making the first demand, at the precise time of
payment, upon the individual partner, and of then using
due diligence in giving notice so as to fix the indorsers?
And, lastly, why did the partner himself assume the respon-
sibility of being first singly answerable for the debt, and of
being obliged to pay it, or to lose his credit before the com-
pany were resorted to? These questions cannot be answer-
ed, as it strikes me, but upon the supposition, that the sel-
ler, as well as the purchaser, understood that the sale was on
a private, and not on a partnership account. The agent of
the plaintiff sufficiently explains, why the note was taken in
this shape, when he says that " the partnership engagement
was to be given for the brandies."

There are other facts which go to prove that the brandies
were understood to be sold to *C. I. Roosevelt*, and not
to the company. The note was called for and given
at the dwelling-house of *C. I. Roosevelt*, not at the
counting-house of the firm; the bill of parcels was made
out in the name of *C. I. Roosevelt* only; the brandy was
entered at the custom-house in his name, and the plain-

tiff made oath there, that the sale was to *C. I. Roosevelt.* This last fact ought to have great weight in forming our conclusions upon the transaction. The affidavit was made before the note was given, and when the intention of the parties must have been well understood and recollected. It was a solemn act, in which we must suppose, that the fact of the sale, and to whom, was stated with caution and precision. It was made by a person who was perfectly competent to scrutinize and feel the force and import of expression, and who must have distinguished quickly and accurately between a sale to an individual, and a sale to a mercantile company. The affidavit is conclusive, that the plaintiff did not then understand there was any other purchaser, than the single individual, and he must have obtained his knowledge of the sale, either from his own view of the act, or from the information of his agent. It appears then to me to be a consequence not to be resisted, that the note was drawn in the shape which we see it, in order to obtain the security of the firm to a debt, which both the contracting parties knew to be the proper debt of the single partner.

The written testimony, from which this conclusion is drawn, weighs much more in the scale of evidence, than the parol testimony (even if opposed to it) of the agents of the plaintiff, given two years and a half after the transaction took place. *John Cross* says, that the bill of parcels was made out as *C. I. Roosevelt* directed, and that he received no directions from the plaintiff, " nor does he recollect" receiving any from *John G. Bogert,* his agent, to make out the bill; that *Bogert* directed him to call for the note, " *but gave him no directions relative to the form of it,*" and when it was delivered, neither *Bogert,* nor the plaintiffs, made any objection to the form of it. This negative testimony then proves nothing. *Bogert* was the principal agent of the plaintiff in the transaction, and he says that he understood the purchase was on a partnership account, although he declares that " *nothing was said relative to whose account the purchase was made.*" It was then a latent inference which he had no authority to draw; and it is a little remarkable,

that if it was understood from the beginning to be a part-

nership purchase, that the agent should say, " *that the sale was not completed until he had satisfied himself by inquiries, that the defendants were partners, and that the partnership engagement was to be given for the brandies.*" The construction, which I give to this parol testimony, goes in confirmation of the written proof; and even if any part of it should be deemed repugnant, it cannot be compared to the former, either in judgment of law, or in its power to produce conviction.

There is one circumstance in the case not well explained. It states, that the sale of the brandies was made by *Bogert*, as agent of the plaintiff. This fact appears to be conceded throughout the case, and *Bogert* himself testifies, that he acted as the plaintiff's agent; and yet it is further stated, that the brandies were in the hands of *Bogert*, as administrator of one *Anthony Carroll*, deceased, by whom the brandies were imported, and that they were sold in part satisfaction of a debt due from that estate to the plaintiff. It is possible, that *Carroll*, and the plaintiff, had been concerned together as partners in importing the brandies, or that *Carroll* acted nominally as owner, and really as agent of the plaintiff on whose capital the business was conducted, for the affidavit of the plaintiff at the custom-house (and which was made to obtain the usual debenture) must have been in the character of purchaser from *Carroll*. But without being able to solve this fact, it is sufficient to observe, that upon this case, the court must consider the plaintiff as the real vendor of the brandies, whatever may have been the form which the title had previously assumed. He was considered by all parties, both at the trial, and upon the argument, as the vendor, and he took the note, as *principal*, for a debt due to *him* from *Roosevelt*. The question of notice, therefore, applies to him as an original party to the sale, and though he may have chiefly effected the sale, and took the note, by means of *Bogert*, his agent, yet in all such cases notice to the agent is notice to the principal.

I am, therefore, of opinion, upon the first point, that the verdict is against evidence. The inevitable inference from the testimony appears to me to be, that the plaintiff or his agent, actually knew, that the purchase was not a partnership concern, and that they required a partnership indorsement, by way of security. Instead of a pointed direction in favour of the plaintiff, the justness of this inference ought to have been submitted to the jury.

2. But if the plaintiff did not in fact know that the purchase was made by *C. I. Roosevelt* upon his own account, and acted under the mistaken impression, that it was a partnership purchase, still the firm were not bound by the indorsement, because the facts disclosed amounted to constructive notice, or notice in law. The partnership between the defendants was confined to the sugar-refining business. It had nothing to do with the purchase or sale of brandies. The partners had given timely and due notice in the public gazettes, of their limited engagement, and had designated the place where their business was to be carried on. Every precaution was taken, which the nature of the case admitted, to guard the public against misapprehension. If persons were, afterwards, under a mistake as to the confined nature of the partnership, it must have been owing to some dealings of the copartnership, inconsistent with its declared object, or to gross negligence in those persons, in not seeking information at the proper sources. The understanding of particular merchants, that the defendants were general partners, was of no avail, without showing that the house had done some act to mislead, or given some reasonable cause for that impression. But there is no evidence before us, according to my view of the case, that the partnership ever misled the public, by a single act, or transacted any business which had not an immediate connection with its limited concern.

The habit of keeping partnership accounts with the banks, I do not consider as forming an exception to this conduct. That habit was perfectly consistent with their

particular and avowed business, and it was, besides, a pri-
vate matter, not in the way of dealing, and which the public
were not to know. The checks and other proper negotia-
tions with the banks, were generally, if not entirely drawn
and conducted by *C. I. Roosevelt*, and it does not appear
that his partner ever knew of or rectified a single transaction
with the banks. What those transactions were ought to
have been explained, and not left, as they are now, by the
case, in total uncertainty. Each partner had a power to
draw checks, in the partnership name, for the partnership
monies in the bank, because it is incident to every partner-
ship, that each partner should have a power to possess and
dispose of the partnership monies and stock. Each partner,
in limited, as well as in general partnerships, can draw
checks and give notes, but it does not follow from thence,
that paper given by a partner, on his private account, would
bind the firm, because here the authority of the partner fails ;
there must, then, be something in the nature of the debt, or in
the nature or conduct of the copartnership, to make the other
partner responsible. There are cases which go the length
of this general proposition, that one partner cannot pledge
the partnership funds, nor make a valid partnership engage-
ment for his individual debt. (*Pinkney* v. *Hall*, 1 *Salk.*
126. and 1 Ld. *Raym.* 175. The cases of *Gregson* v. *Hut-
ton*, and *Marsh* v. *Vansemmer*, cited in 1 *East*, 49. The
opinion of *Le Blanc*, J. in 1 *East*, 55. and of Lord *Eldon*,
jun. in 6 *Ves.* jun. 604.) Whether this doctrine can be sup-
ported, in cases where the person dealing with the partner-
ship is not chargeable with knowledge of the fact, I am
not prepared to say. I believe the *English* law is now un-
derstood to be otherwise, and, perhaps, there is no distinc-
tion in principle, upon this point, between *special* and *general*
partnerships, and that the question, in all cases, is a ques-
tion of notice, express or constructive. All partnerships
are more or less limited. There is no one that embraces,
at the same time, every branch of business ; and when a
person deals with one of the partners, in a matter not with-
in the scope of the partnership, the intendment of law will

be, that he deals with him on his private account, notwith-standing the partner may give the partnership name, unless there be some circumstances in the case to destroy that presumption. "If, says Lord *Eldon*, (8 *Vesey*, p. 544.) under the circumstances, the person taking the paper can be considered as being advertised, that it was not intended to be a partnership proceeding, the partnership is not bound." Public notice of the object of a copartnership, the declared and habitual business carried on, the store, the counting-house, the sign, &c. are the usual and regular *indicia*, by which the nature and extent of a partnership is to be ascertained. When the business of a partnership is thus defined, and publicly declared, and the company do not depart from that particular business, nor appear to the world in any other light than the one thus exhibited, one of the partners cannot make a valid partnership engagement, on any other than a partnership account. There must be some authority, beyond the mere circumstance of partnership, to make such a contract binding. Were it otherwise, it would be idle, and worse than idle, to talk of limited partnerships, in any matter or concern whatever, and the law would be recognising an association, only to render it a most dangerous illusion to those whom it embraced. Lord *Kenyon* must have understood the capacity of one partner to bind the rest with this restriction, when he observed, in the case of *De Berkom* v. *Smith* and *Lewis*, (1 *Esp. Rep.* 29.) that persons might be partners in a particular concern, and if they did not appear to the world as partners, it should not be sufficient to make them liable in cases not connected with the particular business. The law will presume, in all such cases, that the creditor is *advertised*, that he is not dealing on a partnership account, and for him to take a partnership engagement, without the consent of the firm, is, in judgment of law, a fraud upon the firm. Suppose, in the case of a general commercial partnership, a debt was to be contracted by one partner upon the purchase of new lands ; or suppose, in the case of a partnership between two attor-

nies, in law business, a partnership note was to be given by one of them upon the purchase of groceries or furniture for his family, it could not be supposed by any one that the company would be holden. These would be plain cases of a fraud, practised upon the firm, of which the creditor would be chargeable with notice. When the public have the usual means of knowledge given them, and no means have been suffered by the partnership to mislead them, every man is to be presumed to know the extent of the partnership with whose members he deals.

There are, however, qualifications, as to the extent of this doctrine, and some instances occur to me which explain and define its application, and which it may not be amiss to mention.

If negotiable paper of a firm be given by one partner, on his private account, and that paper should pass into the hands of an innocent and *bona fide* holder, as in the case of paper negotiated or discounted at the banks ; or if one partner should purchase, on his private account, an article in which the firm dealt, or which had an immediate and direct connection with the business of the firm, in these cases I should think that a different rule ought to be adopted, and one requiring the actual knowledge of its being a private, and not a partnership dealing, to be brought home to the claimant. The circumstances of these cases would take away the intendment of knowledge in the creditor. The indorsee, for instance, of such a note, takes it upon the credit of the partnership, and he has no means of knowing, from the paper itself, on what account it was created, and he has a right to presume it was a fair partnership engagement. This is the *English* rule (2 *Esp. Rep.* 524. 731.) in those particular cases. But the present case cannot be taken out of the operation of the general rule. The plaintiff had no just ground to infer, that, when he was selling brandy to *C. I. Roosevelt*, he was dealing with the sugar-refining company ; considering the circumstances under which the partnership was announced and conducted, he was

chargeable with notice, that he was not dealing on a partnership account.

I am accordingly of opinion, that the verdict is against law and evidence, and that it ought to be set aside, and a new trial awarded, with costs to abide the event.

New trial granted.