## Case No. 16,791.

UNITED STATES BANK v. BINNEY et al.

[5 Mason, 176.] [1]

Circuit Court, D. Massachusetts.   Oct. Term, 1828. [2]

PARTNERSHIP—INDORSEMENTS OF ONE PARTNER—SECRET PARTNERSHIP—ACCESS TO BOOKS—PRESUMPTIONS.

1. Where a partnership is carried on by a firm in the name of one partner only, and he indorses notes in his own name, the firm is not bound thereby, unless the notes were received or discounted, as notes binding the firm, upon a rep-

[1] [Reported by William P. Mason, Esq.]
[2] [Affirmed in 5 Pet. (30 U. S.) 529.]

resentation to that effect of the partner giving the same, and were made for the common benefit and business of the firm.
[Cited in Palmer v. Elliott, Case No. 10,690.]
[Cited in Stockwell v. Dillingham, 50 Me. 445; Bank of Rochester v. Monteath, 1 Denio, 405; Fosdick v. Van Horn, 40 Ohio St. 465; Burrough's Appeal, 26 Pa. St. 266; Cunningham v. Smithson, 12 Leigh, 44.]

2. "Secret" partnership means, in common usage, a partnership where some of the partners are kept secret, or are unknown, in contradistinction to open or notorious partnership. Where one partner publicly avows all the partners, so that they become and are known as such, and credit is obtained thereby, it is no longer a secret partnership, whether the firm be carried on in the name of one partner only or otherwise.
[Cited in Bisel v. Hobbs, 6 Blackf. 481; Deering v. Flanders, 49 N. H. 227; Chandler v. Coe, 54 N. H. 564. Cited in brief in Deford v. Reynolds, 36 Pa. St. 331. Cited in Benjamin v. Covert, 47 Wis. 382, 2 N. W. 629.]

3. The ordinary presumption is, that all the partners have access to the partnership books, and know the entries therein; but this is a mere presumption from the ordinary course of business, and may be repelled by any circumstances, which lead to a contrary presumption.

4. One partner can bind the other only for objects within the scope of the business of the firm. Secret restrictions of the rights of partners do not affect those persons, who deal with the firm in ignorance of them.
[Cited in Chapline v. Conant, 3 W. Va. 509.]

This was an action of assumpsit, brought by the United States Branch Bank, at Boston, against Amos Binney, John Binney, and John Winship, upon certain promissory notes, made by one Samuel Jaques, Jr., and indorsed by said Winship, which had been discounted at the bank, and protested for non-payment. The plaintiffs claimed to recover the amount of these notes of the defendants, upon the ground, that they were in partnership together under the firm of John Winship; and these notes were indorsed by Winship on behalf of the firm, and the money applied to the use of the firm.

Jaques, who was called as a witness by the plaintiffs, testified, that he knew, by general reputation, of the existence of a partnership between the defendants in the soap and candle business, but had never seen any articles of agreement between them; that it was generally understood, that they were co-partners; that he and Winship both lived in Charlestown, and saw each other every day; and that Winship did no other business to his knowledge, than that connected with this concern; that he had dealings with Winship soon after the commencement of the partnership, and supplied him with rosin to the amount of $400 or $500 per year; that Winship sometimes gave a note for the balance, signed "John Winship," and that witness always took such notes on the credit of the Binneys, with full confidence, that they were interested, and were men of property; that from some time in the year 1823 until the year 1825, witness and Winship

were in the habit of exchanging notes, which were discounted at the different banks in Boston, sometimes signed by one and indorsed by the other, and vice versa; that Winship usually applied for the discounts, and that witness indorsed these notes on the credit of the firm; that Winship always represented them to be for the partnership account, and that witness never understood, that they were on his private account; that the notes in suit were generally presented by Winship for discount, but that witness might have presented some of them; that there were some notes for witness's private account, but that he believed those in suit to have been for the firm; that he could not state, what portion of the money obtained on those notes he had received, but that as he and Winship exchanged notes, he could not say, that he never received any of it; that some of these notes were given for renewals at this bank, and some to take up notes at other banks; that it was his impression, that some of the money, thus obtained, went to pay for rosin, and that one of the notes for $1500 was originally made to take up a note, which had been previously given at the Manufacturers and Mechanics Bank for rosin, that being a material used in defendants' factory; that he knew no particulars concerning the appropriation of the monies obtained upon these notes, and knew of no other, which Winship could have made, but for the use of the firm; that the business of the firm required a great capital, and that Winship often spoke of buying barilla and tallow for defendants' factory; but witness did not know he alluded to these particular notes, nor that the proceeds of them were applied to any other business; that Winship sometimes came to witness and stated, that he wanted witness's name instead of Amos Binney's, because Mr. Binney was absent, and that witness gave his name; that this business of exchanging notes continued until 1825, when witness and Winship stopped payment; that the particular occasion of witness's stopping payment was, the non-payment of his acceptance on a draft drawn on him by Winship for barilla; that witness told Mr. Amos Binney of it, who said he would do nothing about it; that witness furnished the factory of defendants with rosin from 1822 to 1825, and generally received payment in notes; that he had endeavored to trace the origin of the notes in suit, but could trace only two of them, one of $800 and one of $806; that no particular agreement ever subsisted between witness and Winship concerning the proceeds of their accommodation notes; that they sometimes divided the money and each took a portion; that he never knew any actual use, for the benefit of the firm, of the money obtained on the accommodation notes, unless the taking up of the rosin notes should be so considered; that he understood, that Winship was engaged in some shipments of the manufactures of the firm, and also of some other articles, but always supposed them to be on account of the firm, and that Winship always told him they were; that witness was called upon to take up one of these accommodation notes signed by him, and borrowed money of Amos Binney upon collateral security for that purpose, and that nothing was said to Binney about his being liable to pay the note, as the witness recollected. Charles Harris, the discount clerk of the plaintiffs, testified, that the notes in suit were all discounted at Winship's request, and the proceeds passed to his credit; that he considered them to be accommodation notes; that the bank had frequently discounted notes signed by Winship, and indorsed by Amos Binney. Abel Adams testified, that he understood from report, that the Binneys and Winship were concerned together; that when Winship failed, he owed witness from $20,000 to $30,000, for which he had security in bills of lading, policies of insurance, &c. assigned to him by Winship by deed: and that after satisfying his demands, witness assigned over the surplus to Amos Binney; that the property so assigned to witness was abroad in vessels chartered by Winship. John Skinner, partner of Adams, testified, that he knew by common report of the co-partnership between the defendants, and considered, that all his transactions with Winship bound the Binneys; that witness once inquired of Winship, in the early part of the season in which they failed, as to the existence of the firm; that Winship stated it, and offered to show the articles of agreement; that it was generally understood, that there was such a co-partnership; that witness did not know what sort of co-partnership it was, but knew of no other business than the soap and candle business, until the return of some shipments, which Winship had made in 1825; that it was not known that Winship had any other business, in which the Binneys were not concerned. Daniel P. Parker, who was a director in the bank at the time these notes were discounted, and who made himself a witness by disposing of his shares, testified, that it was understood by the directors, when they discounted these notes, that the Binneys were bound by them. Witness understood, that they were partners in the soap and candle business; that a number of notes of this kind were discounted, while other notes, endorsed by Amos Binney, were in the bank. Several other witnesses were produced by the plaintiffs, who testified, that it was generally understood, that a co-partnership existed between the defendants. The deposition of Charles Hood, cashier of another bank, in said Boston, was also read, going to prove, that notes similar to those in suit, had been discounted for Winship at that bank.

The defendants, on their part, produced the original agreement between themselves,

dated September 25, 1817, whereby, the Binneys agreed to furnish a capital of $20,000, for the purpose of manufacturing soap and candles: and Winship agreed to give his whole time and attention to the superintendence of the business, the Binneys to have half the profits and Winship the other half. They also produced a bond of the same date given by Winship to Amos Binney in the penal sum of $10,000, whereby, in consideration of Amos Binney's engagement to indorse his notes for the purchase of stock and raw materials for the purposes of this business, he binds himself not to endorse the notes or paper of, or become in any manner responsible as surety for, any person or persons, other than the said Amos Binney, for the term of two years from the 1st of October, 1817. They also produced John S. Tyler, who was the clerk and agent of Amos Binney at the time of Winship's failure. He testified, that soon after the failure of Winship, all the books and papers were put into his hands; that he examined the books thoroughly, and found no entries of any of the notes in suit, and none of any of which they are stated to be renewals, excepting the two notes of $800 and $806; that the regular business notes of the firm appeared to have been regularly entered in the books, and the payment of them entered in the cash book, but that no such entries appeared to have been made of these accommodation notes; that there were entries of notes signed by Winship, and indorsed by the other defendants severally, to a large amount; that the amount sunk and lost to the Binneys was about $70,000; and that Winship had made annual statements representing the business to be profitable; that in April, 1825, not long before the failure of Winship, the invoices of two shipments, one by the brigantine Susan, and one by the Paul Jones, of beef, pork, lard, &c. were entered in the invoice book of the concern, but that no other entries appeared to have been made of any shipments, excepting of articles manufactured by the firm, and that the outfits in them were about $6,000 or $7,000 each. William Parmenter testified, that he was clerk of the Binneys from 1814 to 1824, and did not know of any business transacted by Winship out of the course of the co-partnership business, and never heard of any of the accommodation notes. Several other witnesses were introduced by the defendants, who testified, that in as far as they had heard of the co-partnership between the defendants, they had heard that it was limited to the manufacture of soap and candles. The foreman in the manufactory also testified, that he kept the books of the concern, and that during the whole time, he never saw John Binney in the counting room, nor Amos more than once or twice before the failure of Winship; that he had carried on the business since the failure, and it had been profitable.

Loring & Hubbard, for defendants, contended, that the co-partnership between the defendants was, in contemplation of law, a secret co-partnership, and did not authorize the giving of credit to any other name than that of Winship. That the jury had a right to infer, from the evidence, notwithstanding the entries of the said shipments in the invoice book kept by Winship, that the Binneys had no knowledge thereof, and could not, therefore, be presumed to have adopted or ratified the conduct of said Winship in making said shipments. That by the tenor of the said recited articles of agreement and bond, the said Winship had no right or authority to raise money on the credit of the firm, or to bind the firm by his signature for the purpose of borrowing money. And they moved the court to instruct the jury, that if, upon the whole evidence, they were satisfied, that the co-partnership, proved to have existed between the defendants under the name of John Winship, was known or understood by the plaintiffs to be limited to the manufacture of soap and candles, they must find a verdict for the defendants, unless they were also satisfied, that these notes were given in the ordinary course of the co-partnership business, or that the monies obtained upon them went directly to the use of the firm with the consent of the Binneys; and that if they were satisfied, that any part of those monies did go to the use of the firm with such consent, that then they must find a verdict for the plaintiffs for such part only, and not for the residue. Secondly:— That if they were also satisfied, that the Messrs. Binneys furnished Winship with sufficient capital and credit for carrying on the business of the firm, no such consent could be implied from the mere fact, that Winship applied those monies, or any part of them, to the payment of partnership debts.

Blair, Blake & Webster, for plaintiffs.

STORY, Circuit Justice. The present suit is brought by the Bank of the United States, as holders of certain promissory notes, signed by Samuel Jaques, Jr., and indorsed by John Winship, which have been discounted at that bank, and protested for non-payment. The plaintiffs found their claim against the defendants upon the statement, that the defendants are partners in trade under the name and firm of "John Winship;" that the indorsement and discount were for the benefit of the firm, and that upon the dishonour of the notes, they are all jointly liable as partners. No question arises as to the due presentment of the notes for payment, and due notice of the dishonour to the defendants. The defence turns upon a point wholly distinct from that. The defendants admit, that they were partners in the soap and candle business with John Winship, in the manner, and to the extent set forth in the articles of co-partnership read at the bar,

and that the business was carried on in the name of "John Winship;" but they deny, that Winship was authorized to make or indorse any such notes, or to bind the partnership thereby; or that they were ever offered for discount, or discounted on account of the partnership, or the proceeds ever were applied to their use or benefit.

In respect to the general law regulating partnerships, there does not seem any real dispute or difficulty. Partnerships are usually divided into two sorts, general and limited. The former is, where the parties are partners in all their commercial business; the latter, where it is limited to some one or more branches, and does not include all the business of the partners. There is, probably, no such thing as a universal partnership, if, by the terms, we are to understand, that every thing done, bought, or sold, is to be deemed on partnership account. Most men own some real or personal estate, which they manage exclusively for themselves. In respect to both general and limited partnerships, the same general principle applies, that each partner has authority to bind the firm as to all things within the scope of the partnership, but not beyond it. Where the contract is made in the name of the firm, it will, prima facie, bind the firm, unless it is ultra the business of the firm. Where the firm imports, on its face, a company, as A., B. & Co., or A., B. & C., there the contracts made by the partners in that name bind the firm, unless they are known to be beyond the scope and business of the firm. But where the business is carried on in the name of one of the partners, and his name alone is the name of the firm, there, in order to bind the firm, it is necessary not only to prove the signature, but that it was used as the signature of the firm by a party authorized to use it on that occasion, and for that purpose. In other words, it must be shown to be used for partnership objects, and as a partnership act. The proof of the signature is not enough. The plaintiffs must go farther, and show, that it is a partnership signature. In the present case, the signature of "John Winship" may be on his own individual account, as his personal contract, or it may be on account of the partnership. Upon the face of the paper it stands indifferent. The burden of proof, then, is upon the plaintiffs to establish, that it is a contract of the firm, and ought to bind them.

The case of Livingston v. Roosevelt, 4 Johns. 251, has been relied upon by the defendants' counsel, as containing the true doctrines of law, applicable to general and limited partnerships. I am not disposed to controvert it. These doctrines may be taken by the jury as correct; and I will quote the language, as it stands in the report, so as to direct the attention of the jury to it. (Here the judge read from the report.) In this case, it is stated, that partners, in limit-

ed as well as in general partnerships, are authorized to raise and borrow money, sign and indorse notes and bills for the common benefit, in transactions relating to the business of the firm. This doctrine has not been controverted at the bar; and indeed it must be true, if such be the ordinary course and usage of trade; for then such an authority must be presumed to be allowed by all the partners for the common benefit. And I know of no principle established to the contrary. Whether the present be a limited or general partnership is to be determined by the whole evidence in the case. It is certain, that by the articles it is a limited co-partnership, and confined to the soap and candle business. Those articles expired, by their own limitation, in two years, and had force no longer, unless the parties elected to continue the partnership on the same terms. That is matter of evidence upon the whole facts. The natural presumption is, that as the partnership was continued in fact, it was continued on the same terms, as before, unless that presumption is rebutted by the other circumstances in the case. There is no written agreement respecting the extension of the co-partnership, and therefore it is open for inquiry upon all the evidence. The present notes were made and indorsed long after the term of two years expired. The plaintiffs contend, that the partnership was then general; the defendants, that it was limited, as before. The jury must determine between them, upon weighing all the facts and presumptions.

It has been said, that this is the case of a secret partnership; that it was the intention of the Binneys, that their connexion with it should be kept secret, and that the management of the business in the name of "John Winship" shows this intention. In point of fact, there is no covenant or declaration in the articles of co-partnership, by which the parties have bound themselves to keep it secret; or that the names of the Binneys should never be disclosed to any persons dealing with Winship in the partnership concerns. In point of fact, too, if the evidence is believed, Winship, immediately after its formation, and during its continuance, constantly avowed it, and made it known, and obtained credit in the business of the firm thereby. He stated the Binneys to be partners; and this statement was generally known and believed by the public, and especially by persons dealing with Winship in respect to the business of the firm. If the jury believe this evidence, then in point of fact, whatever was the original intention of the parties, this was not a secret partnership in the common meaning of the terms. I understand the common meaning of "secret" partnership to be, a partnership, where the existence of certain persons as partners is not avowed or made known to the public by any of the partners. Where all the partners are publicly made known,

whether it be by one, or all the partners, it is no longer a secret partnership, for this is generally used in contradistinction to "notorious," and "open" partnership. And it makes no difference in this particular, whether the business of the firm be carrried on in the name of one person only, or of him and company. Even if some of the partners intend to be such secretly, and their names are disclosed against their wishes and intentions; still when generally known and avowed by any other of the partners, the partnership is no longer a secret partnership. If, therefore, in the present case, Winship, against the wishes and intention of the Binneys, did in the course of the business of the firm make known, that they were partners, and who all the partners were, so that they became public and notorious, I should say, it was no longer a secret partnership in the common sense of the terms; if secret in any sense, it must be, under such circumstances, in a peculiar sense. Sometimes "dormant" and "secret" partners are used as synonymous; but I take it, that "dormant" is generally used, in contradistinction to "active;" and "secret," to "open" or "notorious." However, nothing important turns in this case upon the accuracy of definitions, since it must be decided upon the principles of law applicable to such a partnership as this in fact was, and is proved to be, whatever may be its denomination.

In the present case, Winship was entrusted with the whole business of the firm, as the active partner, and it was to be managed in his name. The business was the manufacture of soap and candles. The particular terms and restrictions of the articles of co-partnership were not, as far as we have any evidence, ever made known to the public, or to any persons dealing therewith. Indeed, according to the very line of argument of the defendants' counsel they were intended to be kept secret. I agree, that the bond is to be taken in connexion with the articles of co-partnership, as a part of the same transaction, and binding the parties. But if neither the bond, nor articles, nor any conditions or limitations, or restrictions therein contained were ever made known to the public, then persons, ignorant thereof, and dealing with Winship in respect to the business of the firm, and trusting him on the credit of the firm with money, or goods, or receiving his notes in payment. had a right to act upon the general principles of law applicable to limited partnerships; and the acts of Winship, in respect to such persons, under such circumstances bound the firm. Winship must be deemed, as to them, to have the ordinary authority to bind the firm to the same extent, and in the same manner, as partners, as the active partners in limited partnerships of a like nature possess. If, indeed, the jury should come to the conclusion, that the part-

nership was ultimately general, or that the Binneys knew, that Winship held them out as his partners generally in all transactions of a commercial nature; or that they knew, that he obtained credit for the firm upon such representations of their joint responsibility; and that these notes were discounted upon such representations, so known to them, and not disavowed or contradicted by them, then the case might justify a broader doctrine. For, under such circumstances, their silence might be fairly construed as a confirmation of his acts; and they ought, in conscience and equity, as well as in law, to bind them. It would be for the jury to consider, how far the evidence would bear out such a conclusion. But supposing the partnership to be limited to the soap and candle manufacture, still if credit is given to the firm within the business of the firm, it binds all the partners, notwithstanding any secret reservations between the latter, which are unknown to those, who give the credit. If credit be given to the firm, within the scope of the business of the firm. no subsequent misapplication of the fund by the partner procuring it, to which the creditor is not privy or party, will exonerate the firm. Even in respect to secret partnerships, where the credit is given only to the ostensible party; yet if it be in the course of the business of the partnership, and for the common benefit, the secret and silent partners are bound; for those, who are to receive the benefit, are also bound to the burthens. If, therefore, Winship borrowed money on the credit of the firm, and applied it to the use of the firm, and the creditor was wholly ignorant of any restrictions contained in the private agreements of the partners. by which it was not necessary for the business of the firm, the firm would be bound. notwithstanding Winship might, in fact, have had at the time other sufficient funds in his hands. It would doubtless be different, if there was any fraudulent connivance between the parties, or a misapplication of the fund, to which the creditor was a party or privy. It is upon this ground, that one partner cannot pay his own separate debt by any contract or payment knowingly made to bind the firm, and which is not authorized by the firm. It has been said, that no conclusion could be drawn unfavourable to the Binneys from any entries contained in the books of the firm, as to their sanction of the proceedings of Winship. That would depend upon their knowledge of those entries. Whether they had such knowledge is matter of fact. upon the whole evidence in the case.. The ordinary presumption is in cases of partnership, that all the partners have access to the partnership books, and might know the contents thereof. But this is a mere presumption from the ordinary course of business,. and may be rebutted by any circumstances,. which either positively or presumptively re-

but any inference of access, such, for instance, as distance of place, or the course of business of the particular partnership; and indeed any other circumstances raising a presumption of non-access.

In the present case the material considerations, then, are these: If Winship was the active partner, and authorized to conduct the business of the firm; and if the particular terms and restrictions of the articles of co-partnership were secret and unknown to persons dealing with him on account of the firm; he possessed, so far as respected such persons, the ordinary powers of partners in like cases of limited partnerships. It has not been denied, that these include (as the case in 4 Johns. 251, shows) a power to borrow money, and for this purpose, to sign and indorse notes and bills in the name of the firm for the business thereof, and to procure discounts thereof. Were these notes of that nature, and the discount thereof procured for the benefit and upon the credit of the firm in the course of its business, without any knowledge on the part of the bank, that Winship had no right under the circumstances to bind the firm therefor? If so, then the plaintiffs are entitled to recover, although Winship may have subsequently misapplied the funds so procured by such discounts, unless the plaintiffs were privy or party to such misapplication. The notes are all indorsed in the name of "John Winship." For aught, therefore, that appears on the face of them, they were notes only binding him personally. The plaintiffs must, then, go farther, and show either expressly or by implication, that these notes were offered by Winship as notes binding the firm, and not merely himself personally, or that the discounts were made for the benefit, and in the course of the business of the firm. It is not sufficient for the plaintiffs to prove, that the bank, in discounting these notes, acted upon the belief, that they bound the firm, and were for the benefit and business of the firm. They must go further and prove, that that belief was known to and sanctioned by Winship himself in offering the notes, and that he intentionally held out to them, that the discounts were for the credit, and on the account of the firm; and that his indorsement was the indorsement of the firm, and to bind them; and that the bank discounted the notes upon the faith of such acts and representations of Winship. The jury will judge from the whole evidence, how the case stands in these respects. The mere fact, that the discounts so procured were applied to the use of the firm, is not, of itself, sufficient to prove, that the discounts were procured on account of the firm. It is a strong circumstance, entitled to weight; but not decisive.

Another point made by the plaintiffs is, that the Binneys have subsequently ratified Winship's conduct, by procuring discounts of a like nature, so as to establish either an original authority in Winship to make such indorsements, and procure such discounts, or at least a ratification, which is equivalent to such an authority.

(The judge then summed up the facts on this as well as the other points, and left the case to the jury.)

Verdict for the plaintiffs.

[NOTE. On writ of error from the supreme court, the judgment was affirmed, with costs and damages at the rate of 6 per cent. per annum. 5 Pet. (30 U. S.) 529.]

UNITED STATES CARTRIDGE CO. (UNION METALLIC CARTRIDGE CO. v.). See Case No. 14,369.

UNITED STATES CORSET CO. (CARSTAEDT v.). See Cases Nos. 2,467 and 2,468.

UNITED STATES CORSET CO. (COHN v.). See Case No. 2,969.

UNITED STATES DISINTEGRATING ORE CO. (GOLD AND SILVER ORE SEPARATING CO. v.). See Case No. 5,-508.

UNITED STATES EXPRESS CO. (UNITED STATES v.). See Case No. 16,602.

UNITED STATES INS. CO. (CRAIG v.). See Case No. 3,340.

UNITED STATES INS. CO. (HENNING v.). See Case No. 6,366.

UNITED STATES INS. CO. (MAREAN v.). See Case No. 9,064.