## W. M. Darlington et al.

### v.

## James P. Garrett, Adm'r, etc.

1. Partnership—Drawing of Draft—Bad Faith of Partner.— In the case of an overdraft, drawn payable to the order of one partner, where the power exists to overdraw in the name of the firm, notice to the drawee of bad faith of the partner overdrawing, would be necessary in order to release the defrauded partners from liability on such draft. The court does not recognize any distinction as to liability, in a case where a partnership has funds in the hands of a third party, and a check or draft is drawn payable to the order of one partner, and a case where a partner is borrowing money and pledging the firm credit.

2. Notice.—The mere fact that overdrafts were drawn payable to a member of a partnership drawing them, would not be sufficient to charge the drawee with notice of such partner's bad faith.

3. What will constitute Notice.—In order to defeat the right of a drawee to hold all the members of a firm liable to the payment of a draft, notice of the bad faith of the partner may be shown by such surrounding circumstances as would be sufficient to put a reasonable man on inquiry, if such inquiry would have brought actual notice. The court is of opinion that the circumstances in this case were not sufficient to show notice of the bad faith of the partner overdrawing.

Appeal from the County Court of Marshall county; the Hon. John Burns, Judge, presiding. Opinion filed February 29, 1884.

Messrs. Shaw & Edwards, for appellants; that the verdict was against the weight of evidence and should have been set aside, cited Pahlman v. Taylor, 75 Ill. 629; Walsh v. Lennon, 98 Ill. 27; Winship v. Bank, 5 Peters, 529; Boardman v. Gore, 15 Mass. 330; Bank v. Winship, 5 Pick. 11; Etheridge v. Burney, 9 Pick. 272; Ex parte Bonbonus, 8 Ves. 540; Swan v. Steels, 7 East, 210; Reidley v. Taylor, 13

East, 175; Story on Bills, §§ 78, 416, 417; Story on Partnership, §§ 105, 106, 126, 140; Comstock v. Hannah, 76 Ill. 530.

Messrs. BARNES & MUIR, for appellee; as to the authority of a partner, cited Marsh v. Thompson Nat. Bk., 2 Bradwell, 217; Wright v. Brosseau, 73 Ill. 381; Parsons on Partnership, 183; Davis v. Blackwell, 5 Bradwell, 32; Collier on Partnership, 678; Zuel v. Bowen, 78 Ill. 234–237; Wittram v. Van Wormer, 44 Ill. 425–527; N. T. Firemen Ins. Co. v. Bennett, 5 Conn. 574; Livingston v. Rooswell, 4 Johns. 251; Wilson v. Williams, 14 Wendell, 146.

Taking payment by the individual creditor out of the firm assets is an actual fraud. And in this State it makes no difference whether the creditor knew he was getting firm effects or not: Buchanan v. Meisser, 105 Ill. 638–644; Casey v. Carver, 42 Ill. 225; McNair v. Platt, 46 Ill. 211; Rainey v. Nance, 54 Ill. 29; Parsons on Partnership, 202.

LACEY, P. J. The appellants were live-stock commission merchants doing business at the Union Stock Yards, in the city of Chicago, and the appellee was the administrator of the estate of Joseph Thompson, deceased, who was a member of the firm of J. Thompson & Co., composed of deceased and one Henry Titus, which firm during the life-time of the deceased was doing business at Sparland, Marshall county, Illinois, in buying and shipping live stock to Chicago.

The claim of appellants, who were the members of the firm of Darlington, March & Co., was filed in the county court against the estate of the deceased Thompson, and was founded on four drafts drawn by J. Thompson & Co. in favor of Henry Titus, the other member of the firm, upon Darlington, March & Co. Three of the drafts were dated Chicago, Dec. 26, 1881, one for $200 and the other two for $300 each. The fourth was dated Chicago Dec. 27, 1881, for $200; all of them were indorsed in blank by Henry Titus. Each had on its back a second indorsement to "pay to the Union Stock Yards National Bank account First National Bank Chicago for collection," signed L. J. Gage, cashier. The first three were paid by Darlington, March & Co. at the Union Stock Yards National Bank,

Dec. 28, 1881, and the last on Dec. 30, 1881, and also indorsed and taken up by Darlington, March & Co. The case was tried before the court and a jury and resulted in a verdict for the appellee, and the appellants bring the case here by appeal, and ask for a reversal on the grounds that the verdict was manifestly against the weight of the evidence, and that the court erred in misdirecting the jury as to the law, and in admitting improper evidence on the part of the appellee.

The defense is based on the fact that Titus, after he had drawn on appellants to the above amounts and it had been paid, converted the money to his own use and absconded, immediately upon the payment of the drafts, and that the appellants were negligent in paying them under the circumstances; and that the circumstances were such as to put them on inquiry, and that for that reason Thompson's estate is not liable for the payment of the drafts.

The facts are that the firm of J. Thompson & Co. commenced business in Novmber, 1879, at Sparland, and continued in business until the time Titus left, the last of December, '81. Their business was buying and shipping live stock to the Chicago market, and they shipped to different firms while in business, and the last few months before Titus left they shipped their stock to Darlington, March & Co., and did their business mostly on credit; Titus was the active business man of the firm, Thompson being a farmer living on his farm in the country, a few miles from Sparland. The drafts in question were drawn by the firm by Titus and indorsed by him without any actual knowledge of Thompson, or special authority to draw them. Titus was in the habit of drawing overdrafts like these on other banks in the firm name, and had, with the knowledge of Thompson, drawn on the First National Bank of Lacon an amount of about $31,886.56 since April 7, 1881, and on the last of December, '81, owed the bank $1,700 overdrafts. There were fifty-eight of those checks.

Thompson had an arrangement with the First National Bank of Lacon, to draw checks upon it for stock, and when they shipped to Chicago and the stock was sold, the proceeds were placed to the credit of the bank with the Merchants Na-

tional Bank in Chicago, which latter bank sent statements of amounts to the Lacon bank from time to time and placed them to its credit, and it had no shipping bills. Titus usually settled up for the firm. Titus was in the employ of Chas. F. Hitchcock, of Peoria, who did business in Sparland, as business manager at Sparland, and went from Sparland on the night of Friday, Dec. 23, '81, and it was not known until Dec. 31st that he had absconded. Up to that time his standing as to business integrity and honesty was good, and Hitchcock was in the habit of trusting him with large amounts of money to use in grain buying at Sparland; there was no limit to the amounts and sometimes he did a large business. Titus stood well in and about Sparland. Thompson and Titus did not cease to do business together until Titus left. Thompson did the most of the buying of the stock, and Titus the most of the weighing of the stock and drawing the checks when the stock was bought in. The firm of J. Thompson & Co. had no capital. Titus went several times to Chicago, and so did Thompson. It appears that it was the habit at the Union Stock Yards, among commission men, to allow overdrafts by shippers when the shipper was in good credit, and J. Thompson & Co. was in good credit at the stock yards. The last shipment was made about the middle of December, 1881, by J. Thompson & Co. to appellants, and was paid by draft for $600, drawn to Asa Daw. When the drafts in evidence were paid appellants did not know that Titus had absconded, and it was not unusual for shippers to draw away from their home office upon their commission men, or in Chicago, and without giving notice, as shown by Overman the book-keeper of appellants; but J. Thompson & Co. never drew before, except accompanying shipment of stock, to meet it, and the appellants had never before advanced money to or for J. Thompson & Co. The usual way is to draw drafts at the time stock is shipped and advise commission men of shipment.

Thompson was sick from and after November 29, 1881, and was unable to do business, and did not know of the business transactions of the firm; but this was not known to appellants. Thompson died in January, 1882.

In order more clearly to understand the evidence and its bearing in the case, we will first consider what effect the fact that the drafts were all drawn payable to Titus, one of the members of the firm of J. Thompson & Co., and indorsed by him, had in law and fact as a notice to appellants that he was not intending to act fairly with Thompson, and that he was intending to appropriate the money to be obtained on the draft to his own use, in fraud of the rights of his partner. For if this is sufficient notice in itself, that should end the controversy in favor of the appellee, for the appellants would be chargeable with bad faith in paying the drafts; and if this is not notice in itself of bad faith, we fail to see how it could be connected with other facts and circumstances, so as to strengthen the evidence and establish notice which would not otherwise be proven.

It is admitted in argument by counsel for appellee, " that if a partnership has funds in the hands of a third party, that a check or draft payable to the order of one partner should be honored because of the power each member of the firm has to collect all debts due the partnership, and the control he has over its funds."

But it is argued that where " one member of a firm is borrowing money and pledging the firm credit, the rule is different. In the latter case, the transaction must be, apparently at least, for the interest of the firm, and it must appear that the money was to be used for firm purposes."

We are unable to perceive any grounds for distinction in the two cases put. While Titus had a right by entire virtue of his being a member of the firm, to draw out the money on deposit, on a draft like the one in question, he would have the same right under the facts of this case to borrow money for the benefit of the firm, and to draw for it by overdraft. He obtained both rights by virtue of being a partner and the scope of the partnership dealing. If, in the case of money on deposit, it were the design of Titus to draw out the money for the purpose of absconding, and converting it to his own use in fraud of his partner, and that fact was known to appellants at the time, and he was attempting to do an act he had

Darlington et al. v. Garrett, Adm'r.

no right to do by virtue of his position as a partner, we can see no reason why appellants would be protected any more than if he was attempting to draw out the money on his individual check; for in substance that would be what he would be doing with full knowledge on the part of the drawee. And in the case of overdraft, where the power exists to overdraw in the name of the firm, notice to the drawee of bad faith would alike be necessary in order to release the defrauded partner from his liability on the draft. The fact that the draft was drawn by the firm in favor of the partner drawing, would be equal notice of bad faith in the one case as in the other. But on principle we do not think the form of the draft should make any difference. Honesty and not fraud is to be presumed in all cases, until the contrary appears; and in case of a stranger dealing with a member of a firm, he has a right, as to transactions within the scope of the partnership, to presume, as his partner has trusted him and given him these extraordinary powers, that he will deal honestly with his partner and not betray his trust; and that as between him and the other partner the law gives him the right to trust him and confide in his integrity.

In the case under consideration, Titus might be drawing the money against the credit of the firm for the purpose of repaying money that he had advanced for the firm, or he might be using the draft in that form as a mere instrument to obtain possession of the money for the use of the firm. · The money goes into his hands at all events, and he might as easily appropriate it to his own use if drawn out in any other way. All reasonable instruments should be in favor of the drawee. In Ex parte Bonbonus, 8 Ves. 540, it is said, "But if it is in the ordinary course of commercial transactions, as upon discount, it would be monstrous to hold that a mere borrowing money on a bill of exchange pledging the partnership, without any knowledge in the bankers—that in a separate transaction, merely because the money is all carried into the books of the individual, therefore the partnership should not be bound."

It is further said in the same case, "There is no doubt now

the law has taken this course, that if, under the circumstances, the party taking the paper can be considered as being advised in the nature of the transaction that it was not intended to be a partnership proceeding *prima facie*, it will not bind him;" thus showing that with notice to the drawee the firm would not be bound; but that the mere fact that the money was carried to the individual credit of the partner drawing the draft, would not amount to such notice to the drawee of the fraudulent intent.

We are of the opinion therefore that the mere fact that the drafts were drawn payable to Titus, the member of the firm drawing them, would not be sufficient to charge the appellants with notice of his bad faith. It remains then to consider whether appellants are chargeable with such notice of bad faith on any other grounds appearing in the evidence. It is contended by counsel for appellee that they are, and that the fact that the draft was drawn in Chicago, away from the home office, and where the firm of J. Thompson & Co. could have no possible use for the money, was sufficient to put appellants on inquiry and was therefore notice. We can not view the transaction in that light. The authority of Titus as a partner of the firm to draw drafts in the name of the firm was not restricted either as to the time or place. He had a right to draw whenever he could get money, and we can see nothing suspicious in the fact that he drew from Chicago, where he often went to do business, and where drafts are often drawn by shippers. Having drawn the money in Chicago, he could very easily carry it home or place it to the firm credit in his bank in Chicago, where they often deposited money to meet the overdrafts on the First National Bank of Lacon. It is contended also that because the drafts were not accompanied with a shipment of stock as is usually done, that that was a suspicious circumstance and was out of the ordinary course of business. The custom requiring drafts to be drawn in that way is simply for the benefit of the drawee, because they are dealing with all sorts of men, and often strangers, and their own safety requires it. Such rule is not established for the purpose of preventing one partner from defrauding another

Darlington et al. v. Garrett, Adm'r.

in the shipping business. Wherever it so happens that the commission merchant has perfect confidence in the financial ability and honesty of the shipper the evidence shows that he relaxes that rule and allows overdrafts without security. In this case appellants did have that confidence in the ability and honesty of J. Thompson & Co. They had long known them and had dealt a good deal with them and everything had been satisfactory. Their reputation also was good for honesty and integrity, both in Chicago and in Sparland, and wherever else they were known in the State; and Thompson was a man of considerable means, worth five or six thousand dollars. Appellants felt safe in trusting the firm with this advance of $1,000 without security. They certainly did have faith in the firm or they would not have trusted them. When everything is summed up, about the only ground for suspicion is that the firm of J. Thompson & Co., by Titus, one of the members, asked credit of appellants for $1,000 without offering security, at a time when the company was in good financial standing with them and were old customers. The appellants granted the request out of an accommodating spirit, and now it is claimed that they should lose the amount because they ought to have known that Titus was intending to defraud his partner Thompson.

We see no evidence upon which to base a charge of bad faith on the part of the appellants toward Thompson. It is claimed on the part of the appellants that the rule of law in such case is, that the drawee of the draft, in order to defeat his right to hold all the members of the firm liable to the payment of the amount of the draft, must have had actual notice of the design of the partner so drawing, or act in actual bad faith, and that even gross negligence would not be sufficient to charge him. On the part of the appellee, it is claimed that notice may be shown by such surrounding circumstances as would be sufficient to put a reasonable man on inquiry if such inquiry would have brought actual notice. The appellant cites Comstock v. Hannah, 76 Ill. 530; and appellee claims that the doctrine was overruled in the latter case of Auten v. Gurner, 90 Ill. 300. The first cited case undoubtedly lays down the rule as

contended for by appellants, and that in a very carefully pre-pared opinion, in which is expressly overruled any expression of opinion to the contrary in any of its former decisions as being judicial dicta.    The point in the Comstock case was whether act-ual bad faith on the part of the indorsee of a promissory note was necessary in order to let in the defense of want of considera-tion on the part of the maker, and the court decided that it was. The Gurner case was where the defense against the note in the hands of the payee was that of fraud and circumvention, and the indorsee claimed that the maker was negligent in not protecting himself against the fraud at the time of executing the instrument, and the judge writing the opinion, after de-ciding that there was no negligence, by way of argument said that there was negligence on the part of the indorsee in not taking notice of suspicious circumstances surrounding the purchase; but the Comstock case was not alluded to, and the observations were mere dictum; and we are not able to say that the court intended to overrule the doctrine so deliberately announced in the first case.    Conceding the rule to be as claimed in regard to negotiable instruments in the hands of the indorsee before maturity, we think that it would by no means follow that the same rule would apply in a case like this, where it is a question of the liability of partners in case of an overdraft ostensibly for the benefit of the firm, but in re-ality for the individual benefit of the member drawing the draft; and where the draft is paid by the drawee on presenta-tion.    The rule applicable to commercial paper might not be held to be the rule in the latter case, and we find the decisions and authority are conflicting.

But we are inclined to hold with the appellee on this point. Marsh v. Thompson National Bank, 2 Bradwell, 217.   Collier on Partnership, 678; N. Y. Fireman Ins. Co. v. Bennett, 4 Conn. 574; Livingston v. Roswell, 4 Johns. 251; Wilson v. Williams, 14 Wend. 146.

The third instruction given for appellee is faulty in being argumentative in calling the attention of the jury to certain facts, such  as to the payee of the draft, the place where drawn, facts insignificant in themselves but which

by being specially mentioned might lead the jury to think that the court supposed them of controlling weight. Instructions like this have often been condemned by the Supreme Court, but such error may not in all cases be of such importance as to reverse; yet in some cases where the evidence is close it will be sufficient. The fifth of appellee's instructions is liable to the same fault. It undertakes to enumerate all the facts especially relied on by appellee, to show notice of bad faith on appellants' part, and only covers appellants' facts by the general statement of all other facts and circumstances in evidence. In fairness it should have mentioned as particularly, the facts that J. Thompson & Co. were old customers of appellants and the standing of the firm was excellent with them in Chicago, Lacon, and wherever else the firm was known; and that the rule requiring drafts to be accompanied by shipments of stock was particularly for the benefit of the commission merchant; and where the merchant was satisfied with the financial ability and integrity of the shipper he did not always require security; and that shippers sometimes drew drafts in Chicago, and other special facts, so as to give appellants' side as fair a summing up as appellee's.

The sixth instruction was wrong as asked, and should have been refused instead of being modified by the court and given as modified. The instruction was that if the "loan was made to the individual order of one partner and for the individual use of such partner, then the other member can not be held, no matter how the firm name may be signed or used, as the firm can in no case be held for private loans to one member of the firm, and one partner has neither the right nor power to bind his firm for his individual debts and loans." The court added " this is the law if the plaintiff knew of the intended misapplication of the funds or had reason to believe it was so intended at the time of the loan, if misapplied by Titus."

The instruction as modified was illegal and misleading. The instruction as first written placed stress on the fact that the drafts were drawn in the name of one member of the firm, and this fact, connected with the other fact, which was not dis-

puted, that the money was for Titus' individual benefit, was intended to be controlling, and was of itself notice to appellants that the money was intended for Titus alone. And if the form of the draft was a controlling fact and constructive notice the instruction would have been correct. But the modification left the jury to say whether the form of the draft as to payee was not sufficient to put appellants on inquiry. And understanding it that way, the jury would be very likely to say as the appellants could read the drafts they ought to have taken notice. The instruction was not framed with reference to such a modification, and with it it was not unintelligible.

On the questions on cross-errors we see no fault with the admission of evidence on appellants' part or with the tenth instruction. It was proper to tell the jury, as it did, that neither the form of the draft nor the fact that it was drawn in Chicago was any evidence under the circumstances to impeach the good faith of appellants, and the instructions for appellee should have been in harmony with it. We have fully examined all the evidence and are of the opinion that aside from the errors of the instructions the verdict was wrongfully against the weight of the evidence, and that the court below erred in not setting aside the verdict and granting a new trial, and for these errors the judgment is reversed and the cause remanded.

Reversed and remanded.